**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**H. E. FLETCHER CO., Respondent.**

**No. 5874.**

United States Court of Appeals
First Circuit.

Heard Dec. 5, 1961.

Decided Jan. 24, 1962.

James C. Paras, Atty., N. L. R. B., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., were on brief, for petitioner.

Henry V. Atherton, Boston, Mass., with whom Warren D. Oliver, Boston, Mass., John P. Carleton, Manchester, N. H., Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., and McLane, Carleton, Graf, Greene & Brown, Manchester, N. H., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board entered May 12, 1961 pursuant to the Board's decision, 131 N.L.R.B. No. 71. The Board found that the respondent, H. E. Fletcher Co., (hereinafter called the Company), had violated Section 8(a) (5) and (1) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 158 (a) (5) and (1) by refusing to bargain with respect to wages with the Union representing its employees and also by refusing to bargain with said Union on and after February 10, 1960 as the exclusive bargaining representative of the employees. The Board's order requires the Company to cease and desist from refusing to bargain collectively with the Union, to bargain upon request with the Union as the exclusive bargaining agent of its employees and to post appropriate notices.

A brief outline of the facts of the labor dispute as found by the Trial Examiner and adopted by the Board is as follows. The respondent is engaged in the quarrying and processing of granite. On September 12, 1958 the United Stone and Allied Products Workers of America, AFL-CIO (hereinafter called the Union), was certified as the collective bargaining representative for a unit of production and maintenance employees at respondent's plant at Westford, Massachusetts. On September 30, 1958 the Union submitted a proposed contract to the Company. This contract, which was the only written agreement which the Union ever submitted to the Company, included demands for a union shop, an extensive seniority system and for a grievance procedure terminating in compulsory arbitration. On what, for present purposes, has come to be the critical provision in that contract—namely, wages—this contract sought a blanket increase in hourly wage rates of fifteen cents over the existing maximum rate paid in each job classification, together with a provision for a cost-of-living escalator clause. This agreement also provided that all information used in computing bonuses should be made available to the Union by the Company and that the method of computing the bonus should be the subject of time study by the Union.

It will be helpful, at this point, to review briefly the various methods of compensation which were in effect at the Company at the time that the Union offered its first (and only) written proposal.

After extensive study and with the advice and assistance of its employees, the Company established a detailed and comprehensive job evaluation plan in 1953. The plan which has been continually in effect since that date was aimed at establishing (and compensating accordingly) the relative value in terms of productive output of the various jobs in the plant. Each job was analyzed in terms of a pervasive[1] list of attributes which thereafter, by means of a conversion factor, was utilized in determining the top hourly dollar rate for a given job. New employees were hired at a figure somewhere below the "top rate" (depending on the supervisor's appraisal of his qualifications and aptitudes) and would thereafter have the opportunity to advance toward the maximum rate through an intermediate range, presumably, as their skills increased.[2]

In addition to the hourly wage rates base upon this job evaluation plan, respondent also had established bonus and incentive programs. The Company maintained an individual incentive program which would reward the individual worker with bonuses predicated on the attainment of certain "points" through achieving established standards of productive output. The respondent also maintained a group or departmental bonus incentive plan and a plant-wide incentive plan known as the "pool." Payments under the pool for any particular year rested in the sole discretion of respondent's treasurer and, the determination of amounts to be paid under both plans involved factors which the Company main-

tained that for competitive[3] reasons it would be unwilling to disclose.

Between September 30, 1958 and February, 1959 the Company and the Union engaged in many collective bargaining meetings. Although the record does not reflect what transpired at these meetings, we may fairly assume that at least some of the discussion related to the subject of wages.

On February 20, 1959 a meeting was held at which the Company submitted a draft of a contract as a counterproposal to the Union's contract. On the issue of wages, the Company proposed that the employees' wage rate should be their "current operator's rate" and that the Company be permitted "in its discretion [to] increase the operator's rate" of any employee. The Company proposed contract was subsequently rejected in its entirety by the Union's membership.

On April 15, 1959 another meeting was held, at which the Company presented a second counterproposal. On the question of wages, this agreement reiterated the Company's previous position—relative to the hourly wage—that employees should continue to receive their current operator's rate so long as they continued on the same job and that it be given discretion to increase the operator's rate of an individual employee and to fix such rates in newly established jobs. The agreement provided, however, that before changing any operator's rate or fixing the operator's rate for any newly established job, the Company would give notice to the Union and, if requested by

1. Each job was analyzed and appraised in the light of eleven attributes, viz., physical effort; hazards, job conditions, supervision; responsibility for safety of others; responsibility for equipment and material; knowledge, equipment and tools; knowledge methods; knowledge, materials; schooling; judgment and initiative; versatility and ingenuity; physical skills.

2. There was no contention that the Union was denied access to information concerning the workings of the plan or the

factors upon which it was based. Such information was always available to the workers at a convenient location in the plant. Respondent indicated at oral argument that data as to the make up of its unit computation was always available to representatives of the Union.

3. Respondent is primarily a contractor and a large supplier of granite to municipal governments. It argued that the necessity of competitive bidding would make disclosure of these factors inimical to its best business interests.

the Union, consult with its representatives on such matters.

In this counterproposal the Company agreed to continue its existing individual incentive system and agreed to make available to the Union information as to the methods used in establishing new or changed standards and awarding points to compute these bonuses. With respect to the two remaining bonus or incentive programs—the department program and the plant-wide or "pool" system—the Company made two alternate proposals. Initially, the Company offered to continue both incentive programs if the Union would waive its right to inquire into matters relating to the operation of the plan.[4] Under the second alternative, both plans would be discontinued. In a note appended to this second alternative, the Company indicated that competitive reasons would preclude it from continuing the operation of these plans if it had to divulge their inner-workings. However, the Company stated that "it was aware that the Union might not wish to agree to such a waiver." This note concluded: "The Company has stated its willingness to consider and discuss any incentive plan which the Union might wish to propose as a substitute for either or both of the present incentive plans. * * * *"

The Union rejected respondent's counterproposal on wages and, two days later, on April 17, 1959, called a strike which lasted some four months. On July 6, 1959, during the course of the strike, the respondent entered into a settlement agreement with the Board's Regional Director, disposing of certain unfair labor practice charges filed by the Union against the Company. Under the terms of the settlement agreement the Company, *inter alia*, agreed to "[b]argain collectively upon request with the [Union] as the exclusive representative of [its] employees."

On August 4, 1959, the General Counsel of the Board approved the agreement and shortly thereafter the strike was terminated. On September 3, 1959, the Company and the Union met in the first of the two collective bargaining conferences which were held subsequent to the execution of the settlement agreement and prior to the institution of the present proceedings. While this meeting was largely devoted to a consideration of the problems stemming from the placement of returning strikers, the subject of wages was not overlooked. Samuel Angoff, one of the Union representatives (and its counsel) asked whether the Company's position at that time was the same as that contained in the Company's previous counterproposal. Upon receiving an affirmative answer, Angoff suggested that the reason why a considerable number of strikers had not returned to the Company after the strike lay in the fact that they were not being paid enough money and, for that reason, many had taken jobs in other plants and industries. He suggested that the Company give an increase of fifty cents an hour, which he said would be the amount which would bring the men back to the plant. Warren Oliver, an attorney, and one of the Company's representatives at the meeting, replied that these assertions indicated possibilities which the Company might not have considered adequately. Oliver told the Union representatives that he would like to explore this matter during the luncheon period and discuss it with officials of the Company who would be in a better position to know the reasons which workers had given for not returning to the Company after the strike. After lunch, the Company's negotiators informed the Union that they did not believe that the wage scale was

4. "Although unilateral action is usually an unfair labor practice it appears to be settled law that a company may lawfully bargain for contract provisions assigning it management functions which it may perform during the term of the contract without consulting the union even though the subject matter is a topic on which the employer is required to bargain collectively." Cox, The Duty To Bargain In Good Faith, 71 Harv.L.Rev. 1401, 1424 (1958).

the determinative factor in the failure of some of the employees to return at the conclusion of the strike, but rather that fear of future tension between the strikers and the non-strikers was the chief element in this regard.

At the conclusion of this meeting Angoff did not fix a date for another meeting but, instead, suggested that the complaints of returning strikers be settled at the local level before another negotiating session was held. The record indicates that all such complaints were satisfactorily adjusted by October 7, 1959.

On October 8, 1959 a representative of the Company contacted an official of the State Conciliation Service to inform him that, while the Company was not seeking a meeting, it stood ready and willing to hold one. The Company heard nothing from the Conciliation Service for almost a month and on November 2, 1959 it again contacted the Service as to the status of negotiations. On November 6, 1959 the Company was informed by the Service that the president of the Union's Local had said: "[T]he Union isn't particularly anxious to have a meeting at this time, things are going pretty well in the Fletcher Co."

Thereafter the Union apparently made no attempt to secure another meeting until December 24, 1959. On this date it wrote the Company a letter which, in asking for a meeting, took note of a contract recently negotiated between the Company and the Teamsters Union in which the Company, *inter alia*, had granted wage increases and a union shop. While questioning the relevance of the Teamsters' contract to the present negotiations, the respondent replied in part as follows: "[W]e are now, as we have been in the past, willing to meet with representatives of your Union in a further attempt to negotiate a mutually acceptable collective bargaining agreement. In that connection we will listen to and carefully consider any further arguments which you or your representatives may wish to make or any new or changed circumstances which you or they may wish to bring out, including, if you wish, the fact of the execution of our contract with the Teamsters Union." As a result of this interchange, a second negotiating session was held on February 4, 1960.

This meeting was attended by attorneys John P. Carleton and Warren D. Oliver, representing the respondent; attorney Warren H. Pyle, representing the Union; the Union's International Secretary-Treasurer, John C. Lawson; the Union's Local President, James Keenan; and a committee of employees. There were also present representatives of the Federal and State Conciliation Services. At the morning session of this conference, Pyle made a detailed and exhaustive review of the counterproposal which respondent had previously submitted, noting which proposals were acceptable, which were not and suggesting some modifications. At this time, Pyle informed respondent's representatives that the Union would modify its union security request to a maintenance of membership provision. Concerning wages, Pyle initially requested that the Company supply the Union with a list of the wage increases that had been given to certain employees between September 3, 1959 and February 4, 1960. This was to supplement a previous list which the Company had earlier furnished to the Union. The Company agreed to furnish this list and subsequently did so. Pyle then stated that the Union wanted a wage package of twenty-five cents an hour, the precise breakdown of which would be subsequently determined.

The Union still maintained that the Company's counterproposal on wages was unsatisfactory in its entirety. After Pyle had concluded his statement of the Union's position on each of the provisions contained in the Company's counterproposal, Oliver stated that it was obvious that the parties were still far apart on the four major issues in dispute, namely, arbitration, seniority, wage increase and union security and that the talks should thereafter focus on these topics. Nonetheless Oliver stated that during the luncheon period, the Company's representatives would consult with their prin-

cipals on all aspects of the contract, including the Union's provision on wages as outlined by Pyle, and would report back the Company's position at the afternoon session.

When the conference resumed in the afternoon, Oliver outlined the Company's position on the proposals which the Union had put forth in the morning session. The Company made certain concessions and complete agreement was reached on relatively minor issues. However, as to the four major issues, Oliver stated that the Company was not persuaded at that time that it should make any change in its bargaining position as the Union had adduced no new facts or circumstances which would cause it to retreat from its present position.

Towards the end of the afternoon session, according to the testimony of Pyle, there occurred an asserted colloquy between Pyle and Oliver on the wage issue which formed the basis of the Trial Examiner's conclusion that the Company refused to bargain with respect to wages. On this testimony, the Trial Examiner made the following finding: "In an attempt to make some progress on the wage issue, Pyle asked Oliver if the Company would sit down with the Union and work out a single wage rate applicable to each classification. Oliver replied, 'no, the Company wouldn't.' Pyle then asked if the Company would sit down with the Union and work out a schedule of rate ranges applicable to each job classification. Oliver replied, 'no, the Company would not.'"

Shortly before the close of the meeting Oliver stated that he believed that the parties were fully as far apart on major issues as they were at the previous meeting. At this point Keenan said that he agreed with Oliver and shortly thereafter the meeting concluded.

Following this meeting, the Company wrote the Union a letter dated February 10, 1960, in which it declined to recognize the Union further as bargaining representative until the Union had been recertified as such representative, pursuant to the Board's election procedure. In this letter the Company stated that it "doubt [ed] that a majority of our present employees * * * in the bargaining unit for which you were certified now wish to be represented by your Union." The Company asserted that it had "fully complied with the terms of the Settlement Agreement" because, in its opinion, "at the last negotiating meeting * * * the parties were at a complete impasse."

Coincident with the mailing of this letter, the Company filed an employer representation petition with the Board's regional office. This petition was subsequently dismissed by the regional director because of the issuance of the complaint in the present proceedings.

Upon the basis of the foregoing facts, the Trial Examiner found, and his findings were adopted by the Board, two separate violations of Section 8(a) (5) and (1) of the Act. First, on the basis of the above-described conversation between Pyle and Oliver, the Board found a refusal to bargain in good faith with respect to wages. Secondly, the Board found that the Company also violated Section 8(a) (5) and (1) of the Act by refusing after February 10, 1960 to continue to recognize and deal with the Union as the exclusive collective bargaining representative of its employees "whether or not it had a good faith doubt of the Union's majority status." This finding stemmed from the action of the Company in sending its letter of February 10, 1960.

We will consider these findings in inverse order. In concluding that the Company violated Section 8(a) (5) and (1) of the Act by refusing after February 10, 1960 to recognize and bargain with the Union until the latter was recertified, the Board found that a reasonable time had not elapsed since the parties had entered the settlement agreement and that the negotiations were not in fact at the impasse which the Company asserted. Under these circumstances the Board concluded that respondent was under an obligation to bargain with the Union regardless of any *bona fide* doubt which it might have felt as to whether the Union had a majority of the members in the relevant bargaining unit. And, by seeking to escape this obligation through its

letter of February 10, 1960 the Company violated Section 8(a) (5) and (1) of the Act.

█ It has been held that once a company enters into a settlement agreement requiring it to bargain in good faith with a union, the company must abide by that obligation for a *reasonable time* thereafter, without raising a question as to the majority status of the union. See, Poole Foundry & Mach. Co. v. National Labor Rel. Bd., 192 F.2d 740 (4 Cir. 1951). However, conversely, if a reasonable time has elapsed, with the company in compliance with the terms of the agreement, we perceive no reason why a company should be precluded from testing any question it might have relative to the continued majority status of the Union by filing a representation petition. Here, we need not decide the question of whether such a reasonable time had in fact elapsed nor whether the proceedings had actually reached an impasse for there is another ground which, in our view, vitiates the Board's petition for enforcement.

█ Before the Board and here on appeal, the Company contended that the matter of its asserted refusal to recognize and bargain with the Union on and after February 10, 1960, was not properly in issue because such violation was never alleged in the complaint. In this contention, respondent is assuredly correct for the complaint is totally devoid of any allegation which would put it on notice that the reasonableness of the post-settlement time interval was challenged. Consequently, respondent presumably had every legitimate reason to believe that the question of whether or not a reasonable time had elapsed was not one of the issues in the case. The belief was undoubtedly confirmed by the opening statement of counsel for General Counsel who stated at the hearing: "The issue which is before you today is rather narrow and confined to whether or not the Company bargained in good faith with the charging Union with regard to the issue of wages."

At the conclusion of the opening statement there occurred a colloquy between counsel for General Counsel and the Trial Examiner which confirmed this exclusivity of issue, and, thereafter, at no time during the course of the hearing was there any contention made that respondent's refusal to recognize the Union beyond February 10, 1960, constituted a violation of Section 8(a) (5) and (1). In sum, the Board made a finding of a violation which was neither charged in the complaint nor litigated at the hearing.

██ We believe that it would derogate elemental concepts of procedural due process to grant enforcement to such a finding. As was stated in Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 283 (2 Cir. 1957): "The complaint, much like a pleading in a proceeding before a court, is designed to notify the adverse party of the claims that are to be adjudicated so that he may prepare his case, and to set a standard of relevance which shall govern the proceedings at the hearing." Where the Board improperly makes its finding on a charge not contained in the complaint, and the record discloses that the basis of this finding has not been litigated at the hearing, such finding is not entitled to enforcement, see, National Labor Rel. Bd. v. Bradley Washfountain Co., 192 F.2d 144 (7 Cir., 1951). In seeking to avoid this result the Board relies on our decision in N. L. R. B. v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941 (1 Cir., 1961), where we granted enforcement to a finding not contained in the complaint. However, in that case, as we expressly pointed out, "The issue of such a discharge [the finding there questioned] was fully litigated at the hearing * * *." Id. at 947. Here, the question of whether the Company's letter of February 10, 1960 contravened the continuing obligation of the settlement agreement and violated Section 8(a) (5) and (1) was never "fully litigated at the hearing" and, consequently, we are unwilling to enforce the Board's order in this regard.[5]

5. At oral argument petitioner suggested that respondent has the burden of specif-

ically demonstrating how it has been prejudiced by the failure to allege this

We turn then to a consideration of the Board's finding that respondent failed to bargain in good faith on the issue of wages. As noted above, the sole basis for this finding stemmed from an incident which assertedly occurred during the afternoon meeting of February 4, 1960. Thus, Pyle, after reviewing the day-long negotiations, testified before the Trial Examiner that:

"Well, then, in an effort to make some progress and to get somewhere on the wage question, I asked Mr. Oliver if the company would sit down with us and work out a scale of wages which would be applicable, a single rate applicable to each classification. Mr. Oliver said no, the company wouldn't. Well, then I assumed that the company must have a system of rate ranges rather than single rates; so I asked 'Well, will you sit down with us and work out a schedule of rate ranges applicable to each job classification,' and Mr. Oliver said no, the company would not."

The Trial Examiner obviously concluded that the alleged responses of Oliver to Pyle's questions were outright refusals to bargain further with respect to wages—in effect, to place the subject of wages "off limits."

In its brief here, as before the Board, the respondent denies that the critical colloquy, as testified to by Pyle, ever took place. However, although Oliver followed Pyle to the stand at the hearing, he did not at that time expressly or directly contradict Pyle's version of the colloquy. Nonetheless, while not specifically alluding to and denying the particular portion of Pyle's testimony which subsequently came to form the basis of the present violation, Oliver did testify as follows in response to a question on direct examination: "Now, was there discussion by the Union of a single rate for each job, or a

schedule of wage ranges for jobs?" Oliver answered: "The only discussion at that meeting with respect to a single rate for each job was the Union's statement of its wage demand that they wanted the contract to provide for a fixed rate for each job, which could not be changed by the Company without an agreement of the Union."

While, perhaps, respondent would now be in a better position had Oliver's testimony contained a specific contradiction of Pyle's testimony, his above-cited response could be regarded as an inferential dilution of the thrust of Pyle's testimony. In effect, the testimony might be read as indicating that the only colloquy concerning wages in which Oliver refused to acquiesce concerned the specific Union demands as opposed to an outright refusal to discuss wages.

With the evidence thus in equipoise, and in the light of the ambivalence of Oliver's response, the Trial Examiner felt that an issue of credibility was raised, viz., whether Oliver or Pyle's recollection of the events at the negotiating session was to be believed, and, accordingly he credited the testimony of Pyle.

We have, of course, made it plain that the determination of credibility clearly rests with the Trial Examiner and the Board, and absent an incredible result, resolutions of credibility will be accorded great deference on review. N. L. R. B. v. C. Malone Trucking, Inc., 278 F.2d 92, 95 (1 Cir. 1960); National Labor Relations Board v. Lunder Shoe Corp., 211 F.2d 284, 288 (1 Cir. 1954). However, in the instant case it is not at all certain that the respective testimony of Pyle and Oliver presents a question of credibility in its usual sense. That is to say, the two versions do not necessarily rise to the level of inextricably competing accounts of a single event wherein the worthiness of belief to be accorded one witness compels a disbelief

violation in the complaint. While respondent has not made such a specific showing it has strongly indicated that its case would have been tried differently had

it known that this issue was in the case. We believe that, on the present record, it need assert no more in order to be entitled to relief.

in or rejection of the other. Rather, as we shall endeavor to develop below, we believe that this is a situation where Pyle may well have phrased his interrogations on the wage issue precisely in accord with his testimony at the hearing. Similarly, Oliver's recollection of this discussion and his response, viz., a negation of the Union's demands, may also have been consonant with his position at the negotiating session and it need not follow that the two accounts would be necessarily antithetical. We believe that placing this colloquy, in the context of the entire record, it may fairly be said that so far as reaching a common level of meaning and understanding, these particular questions and answers intellectually passed as ships in the night.

■ There can be little question that the subject of wages lies at, or close to, the heart of every attempt at labor-management negotiation, and as such is a subject upon which the employer has a duty to bargain collectively and in good faith. This proposition is by now so well settled that citation of authority would be superfluous. Of course, in this area as in others, this duty does not mean that the employer may be forced to agree on anything. "All that good faith requires is that the employer treat the issue as one to be resolved by bargaining and be willing with an open mind to consider the opposing arguments and explore the possible solution." Cox and Dunlop, Regulation of Collective Bargaining By The National Labor Relations Board, 63 Harv.L.Rev. 389, 422 (1950).

■ Here the Board obviously concluded, based on Pyle's testimony, that Oliver not only had the closed mind which would violate Section 8(a) (5) and (1) but that he was candid enough to clearly articulate this mental condition, thus obviating recourse to the more circuitous modes of proving such a proscribed condition. The record reflects that Oliver is a well-experienced attorney in the field of labor relations. It is not lightly to be assumed that an attorney of such experience and background would be as insensitive to the requirements of the Act in this area as to flatly and expressly reject any serious request from the Union to discuss such a basic issue as wages—particularly, in the presence of federal and state mediators. We do not believe that we are compelled to totally disregard human experience in attempting to give coherence to the colloquy between Pyle and Oliver.

Thus, assuming, as we do, that Pyle's recollection of events at the bargaining session was correct, the following situation may well have obtained. Pyle's initial question to Oliver was whether the Company would sit down with the Union and work out a *single* (not a *starting*, as found by the Trial Examiner) wage rate applicable to each classification. In the form that this question was addressed to Oliver it undoubtedly had a double aspect. The question was dual-edged in that it involved the query of whether the respondent would sit down with the Union, and secondly, the question of whether the Company was willing to agree to a single wage rate which would be applicable to each job classification. Patently, it was thus a question to which Oliver could not have given a single affirmative answer without committing the Company to a concession it was neither prepared—nor under the law—required to make. However, the Company had in fact been "sitting down" with the Union all day on February 4, 1960, (and, indeed, at various times since September, 1958) and had discussed at some length the Union's demand for a single wage rate applicable to each job classification. Moreover, the Company had already agreed that following the February 4th meeting they would hand over to the Union certain data which the latter had requested concerning the subject of wages. In this posture, the respondent suggests, and we agree, that Oliver had the right in the informal give and take of the negotiating session to assume that he was merely being asked again whether the Company was willing to accept the Union's demand for a single wage rate which would be applicable to each job classification.

As to the second question, it is obvious that Pyle was aware that under the

Company's job evaluation plan a rate range was already in effect. This had been the subject of extensive discussion. Thus, it is fair to infer that, as understood by Oliver, Pyle's question was not whether he would "sit down" but whether Oliver would agree to a rate range which was higher than that currently in effect. Consequently, as thus understood he would assuredly be within his rights in answering the question in the negative, since the Company had consistently taken the position that it desired to continue its present system and that the Company was unwilling to increase its wage costs. Again, Oliver could not have given a single affirmative answer without committing the Company to a concession it was neither prepared nor required to make. In short, we believe that Oliver's negative responses were not disinclinations to "talk" but rather to "terms"— the terms which—to that point had been advanced by the Union.

An analysis of this colloquy, even when reviewed in the light most favorable to the Board, shows little more than unguarded answers to double-edged questions. Nonetheless, on this colloquy and this alone—the Board found an outright refusal to discuss and explore the possibility of reaching an agreement on the subject of wages. We believe that on this record more is required to support the image of a company mind closed to and unwilling to discuss the question of wages.

On a consideration of the entire record we cannot say that the actions of the Company bespoke a mind closed against agreement with the Union on this subject. It may be said fairly that it was the Company and not the Union which appeared more interested in holding collective bargaining meetings. At these meetings the respondent appeared fully willing to consider opposing arguments and explore competing solutions on all issues, including that of wages. The record indicates that when the Union advanced new facts which might impinge on this issue, these facts were expeditiously reported to the principals of the Company for any impact which they might have on the course of negotiations. On the wage issue, the Company came forward, on two occasions, with written counterproposals to the Union's demands. On the significant question of the character of the incentive plan, the Company's counterproposal of April 15, 1959 contained an express invitation to the Union to submit any alternative method or formula which it desired, for the establishment of a bonus or incentive plan. No such substitute was ever forthcoming.[6]

6. At the hearing, Pyle testified on cross-examination as follows:

"XQ. So since the original union proposal was submitted to the company, there has been no counter-proposal furnished by the union in the form of a written contract, complete written contract. A. Well, we never withdrew our proposal; we didn't feel that your offers were substantial enough to merit any proposal; we thought your offers were calculated to withdraw an objection, and didn't come anywheres near what we thought a reasonable contract would be.

"XQ. You never withdrew the original proposal, and, of course, you never submitted a new complete proposal, is that right, regardless of the reasons for it, isn't that the fact? A. No, we never submitted a new contract. We had told you what we wanted in the first contract.

"XQ. Did you ever submit any written, from the time the original proposal of the union was furnished, did you ever submit any written redrafts of any of the clauses of— A. No.

"XQ. —of your original contract? A. No.

"XQ. The company counter-proposal furnished on the 15th of April, 1959, under Article VIII, the Wage clause, contains an invitation or an alternative to the union to submit a formula or a method setting up a bonus or an incentive plan, does it not? A. It speaks for itself.

* * * * *

"XQ. (By Mr. Carleton) Then let me ask you this. Since receipt by the union of this counter-proposal of April 15, has the union ever furnished to the company in writing any bonus or incentive plan in response to the company's invitation for it to do so? A. Well, as I told you, I was not present at any meeting up until February 4 of this year;

To be sure a major difficulty in the negotiations was the gulf between respondent's existing wage and incentive systems and the system the Union wished to establish. However, while there existed this obviously wide gulf in the respective positions of the parties, as noted above, we cannot say that the Company's mind was closed to the possibility of bridging this gulf.[7] On the contrary, the record amply reflects that the Company representatives displayed a constant willingness to participate in the mutual interchange of views and ideas which the Act was designed to foster. More than this cannot be asked.

The petition for enforcement of the Board's order is denied and dismissed.

Before JOHNSEN, Chief Judge, and MATTHES, Circuit Judge.

but I don't believe we have ever done that. * * *"

7. We do not believe the fact that the Company questioned the majority status of the Union after February 10 can, on this record, be taken as an indicia of unwillingness to bargain on wages. The facts indicate that the Company had ample reason to question the Union's majority status. On February 4, 1960 there were 171 employees in the bargaining unit of whom 106 had a normal attendance during the strike. Twenty additional employees had worked part time during the strike and one was a returned soldier who had been in the service. On February 4, some sixty-two per cent of the employees in the bargaining unit had worked throughout the strike and only some twenty-six per cent of the men failed to work at any time during the strike.