**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALVA ALLEN INDUSTRIES, INC., Respondent.**

**No. 18360.**

United States Court of Appeals
Eighth Circuit.

Dec. 2, 1966.

Glen M. Bendixsen, Atty., National Labor Relations Board, Washington, D. C. for petitioner. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington, D. C., were with him on the brief.

William L. Turner of Gage, Hodges, Park & Kreamer, Kansas City, Mo., for respondent. John H. Kreamer, of Gage, Hodges, Park & Kreamer, Kansas City, Mo., was with him on the brief.

Before VAN OOSTERHOUT and GIBSON, Circuit Judges, and NICHOL, District Judge.

FLOYD R. GIBSON, Circuit Judge.

National Labor Relations Board, petitioner, seeks enforcement of its Decision and Order dated September 29, 1965 reported in 154 NLRB No. 132, issued against Alva Allen Industries, Inc. (Company), Respondent, for violation of § 8 (a) (5) and (1) of the National Labor Relations Act as amended.[1] The Company is a Missouri corporation with its principal place of business at Clinton, Missouri, and is engaged in the manufacture of punch presses.

The Board found that the Company committed an unfair labor practice as defined by the Act by refusing to bargain in good faith with the Union during the first year of the Union's certification as bargaining representative. This proceeding is filed pursuant to § 10(e) of the Act and jurisdiction is established.

The basic objective facts are not in dispute, which leaves only for determination the inferences to be drawn from the facts, intent, and the subjective facts together with the proper application of the law. The International Brotherhood of Electrical Workers, Local Union 814, AFL–CIO (Union) was selected by an appropriate unit of the Company's employees in a Board election held in April 1963. On May 6, 1963, the Board certified the Union as the sole bargaining agent of these employees.

Subsequent to this certification, representatives of the Union and the Company met, negotiated and reached accord on about 80 to 85 per cent of the issues confronting them. Two major issues of disagreement, however, were wages and union security. This disagreement resulted in the Union's calling an economic strike on July 3, 1963 in an attempt to enforce its demands. Within a week or two following the walkout, the Company commenced hiring permanent replacements for the employees then on strike, and by late October 1963 had permanently replaced all of the strikers. All of the members of the original bargaining unit went out on this strike, so that all 40 employees originally comprising this bargaining unit were replaced by employees who crossed the picket line set up by the Union.

As a result of picket line violence a state court injunction against breach of the peace was issued. Continued violence resulted in criminal contempt citations being served on about ten strikers for alleged violation of that injunction.[2] The Union filed unfair labor practice charges with the Board after the strike but these charges were dismissed in November 1963.

It was in this tense atmosphere of violence and unfair labor practice charges that the parties assembled at the Post Office in Clinton, Missouri, in August

---

1. As set out in 29 U.S.C. § 158(a) (1) and (5):
 "(a) It shall be an unfair labor practice for an employer—
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * * * * * *

 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

2. The contempt proceedings were still pending at the time of the Trial Examiner's decision, and the Record is silent as to the disposition thereof.

1963 to meet with Commissioner Harding of the Federal Mediation and Conciliation Service. This was the first negotiation to take place subsequent to the strike of July 3rd. The parties met separately with Commissioner Harding, each presenting its proposals. The Company indicated a willingness to alter several of its proposals, including agreement to a maintenance of membership clause. Apparently owing to the tense situation, the wide differences in the proposals and the Union's uncompromising position on its demands, the Commissioner concluded that an impasse had been reached and that a joint meeting of the parties would serve no purpose. The record discloses no communications or negotiations between the parties during the next three months.

Finally, on November 30, 1963, the Company communicated with the Union indicating that it was contemplating providing employees with a day of paid vacation in lieu of the normal Christmas bonus and party. The letter of that date continued, "Should you wish to discuss this or any other aspect of our employees' wages, hours or conditions of work, please let us know." After additional correspondence, the Company suggested a meeting for the week of December 16, 1963. Because of conflicting demands upon participants' time, a meeting was not arranged until February 14, 1964. The Union's attorney failed to appear at this meeting, and it was rescheduled for February 18, 1964. On February 18, 1964, the parties met in the office of Commissioner Harding, the first joint meeting since the strike of July 3, 1963. The Company's representative expressed a belief in the lack of representative capacity of the Union. Nonetheless, it appears that the parties discussed issues of union security and wages. Though the Union reduced its demands, it still demanded the firing of the strike-breaking employees and the reinstatement of the former employees. The Company did indicate that it would consider a plan for preferential hiring of the striking employees. Other than this no results were achieved and a second meeting was sched-

uled for March 11, 1964. At this meeting the Union further reduced its demands on wages and union security, but insisted that striking employees be reinstated and contempt citations against the strikers be withdrawn. General terms of a preferential hiring agreement were discussed. The attorney for the Company indicated that he did not believe the Company would accept any type of union security due to its belief that the Union did not represent a majority of the employees.

In a series of three letters dated March 17, 18, and 19 the parties stated their respective positions. The Company rejected the latest Union proposals, noted that it had previously withdrawn all of its prior offers and any agreement would have to be renegotiated in view of the altered circumstances, but added, "[W]e would be glad to meet with you at any time to discuss any issue between us."

The next and last meeting between the parties came on April 24, 1964. The Union withdrew all demands of any kind with respect to wages, union security, and the preferential hiring of striking employees. In effect the Company was given a "blank check" to write the contract in any way it desired. The Company representative voiced the opinion that the Union's action indicated that the Union was not interested in any of the plant employees but merely interested in barring an election. The Union certification year would expire in only eleven days hence, on May 6, 1964.

The proposal was presented to the Company officials and on the following day, April 25, 1964, the Company wrote to the Union, "Alva Allen Industries does not believe that your union represents its employees, * * *. Accordingly, we will no longer meet with you or representatives of the union."

Upon complaint of the Union these facts were presented before a Trial Examiner of the National Labor Relations Board. In a decision of October 29, 1964, the Trial Examiner concluded that the Company had bargained in good faith until the letter of April 25, 1964, that it was

justified at this time to break off further negotiations, and that the General Counsel had failed to carry the burden of proving an unfair labor practice.

On exceptions filed by the General Counsel a three-member panel of the Board, selected pursuant to § 3(b) of the Act, reviewed the Trial Examiner's decision. Although this panel accepted the Trial Examiner's factual findings and ruled that he had committed no prejudicial error, it did not agree with the Trial Examiner's conclusion that respondent had bargained in good faith with the Union. In examining the facts found by the Trial Examiner the Board concluded:

> "That the Respondent predetermined not to reach and sign a collective-bargaining agreement with the Union is graphically demonstrated by its continuing questioning of the Union's majority and its adamant and uncompromising insistence that the Union did not represent the employees, even when the Board's certification of the Union had approximately 3 more months to run.
>
> \* \* \* \* \* \*
>
> "Accordingly, we find that the Respondent on and after February 18, 1964, refused to bargain in good faith with the Union as the certified representative of its employees in violation of Section 8(a) (5) and (1) of the Act." [3]

The broad and general issue before us is whether on the record as a whole this conclusion of the Board is based upon substantial evidence. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The basic facts being undisputed, the general proposition resolves itself into this specific question: Under the circumstances of this case does the expression of doubts as to union representation, the failure to accept union demands, and the refusal to continue bargaining some eleven days prior to the end of the certification year owing to an apparent lack of majority representation demonstrate that the Company has been guilty of the unfair labor practice of refusing to bargain in good faith?

Under prevailing Board rulings, after the one-year certification period [4] has expired, if a company has fair doubts about a union's continuing majority, it may refuse to bargain further. General Counsel Administrative Decision, 1962 CCH NLRB § 11,416; Celanese Corporation of America, 95 NLRB 664 (1951); Lawn-Boy Division Outboard Marine Corp., 143 NLRB 553 (1963); CCH Labor Law Reporter § 3046. And majority status is open to fair doubt when a large percentage of employees on economic strike have been permanently replaced. Stoner Rubber Company, Inc., 123 NLRB 1440 (1959); Titan Metal Manufacturing Co., 135 NLRB 196 (1962); Celanese Corporation of America, supra. The better and safer practice suggests that the employer with good faith doubts as to representation should continue negotiations and petition the Board for a new election or other relief. See N.L.R.B. v. Superior Fireproof Door & Sash Company, Inc., 289 F.2d 713, 719 (2 Cir. 1961). Nonetheless, when it is apparent that the union no longer represents a majority of the employees the unilateral refusal to bargain with the union after the one-year period of time will not rise to the dignity of an unfair labor practice. Edward Fields, Inc. v. N.L.R.B., 325 F.2d 754 (2 Cir. 1963); N.L.R.B. v. Downtown Bakery Corp., 330 F.2d 921 (6 Cir.

---

3. Though the Board found an 8(a) (1) violation there is no evidence of any interrogation, surveillance or any other such act that would constitute restraint or coercion of employees. As the Trial Examiner correctly found, a § 8(a) (1) violation in this case must be derivative of an 8(a) (5) refusal to bargain. Absent the finding of an 8(a) (5) violation the 8(a) (1) violation has no support and must fall.

4. 29 U.S.C. § 159(c) (3) reads, in part, as follows: "No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held."

1964); N.L.R.B. v. Southern Coach & Body Company, Inc., 336 F.2d 214 (5 Cir. 1964).

■ However, in the situation where an employer refuses to bargain on the basis of lack of representation during the year following certification, a different position is taken. In *Kimberly-Clark*, 61 NLRB 90, 92 (1945) the Board enunciated the so-called one-year certification rule in the following language:

"We have consistently held, both in unfair labor practice cases involving Section 8(5) of the Act, and in cases arising under Section 9(c), that a Board election and certification must be treated as identifying the statutory bargaining agent with certainty and finality for a reasonable period of time —about a year, under ordinary circumstances."

In upholding this rule, the Supreme Court in Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), ruled that a certification based upon an election must be honored for a "reasonable period, ordinarily one year", in the absence of "unusual circumstances." The Court held that an employer was free to question representation after a lapse of this period, but should he challenge representation by refusing to bargain during this period, absent "unusual circumstances", he would be guilty of an unfair labor practice.

The reason for this rule is clear. After receiving certification the union is entitled to a reasonable length of time in which to conduct negotiations. It is entitled to a chance to get results without being harassed by constant challenges to its representative capacity. Mr. Justice Frankfurter, speaking for the Court, in Brooks at page 103 of 348 U.S., at page 181 of 75 S.Ct., summarized it thusly:

"The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it."

■ In the case before us the Board specifically found that the Company refused to bargain in good faith from the February 18th meeting to the end of the certification period, placing primary emphasis on the Company's raising the question of majority status of the Union. We believe the Board's reliance on this fact is entirely misplaced. What is condemned by the Board in *Kimberly-Clark* and by the Supreme Court in *Brooks* is not the mere expressing of an abstract doubt of majority status, but the refusal to bargain because of this doubt. See, American Steel Foundries, Cast Armor Division, 112 NLRB 531, 534 (1955). It is only the refusal to bargain that is condemned. Here from May 6, 1963 until April 25, 1964 the Company at all times held itself ready to meet with the Union to discuss the issues. During this period there was no refusal to bargain. Until the Union's reply letter of December 5, 1963, some five months after it called its economic strike, the Union had failed even to suggest a meeting. Even then the negotiations were actually inspired by the Company's letter of November 30th expressing a willingness to negotiate, while the Union's response indicated only an interest in the striking employees, all of whom had been replaced. The Company suggested an early meeting and cooperated fully with Commissioner Harding in setting up the meeting for February 18. At the February meeting, despite expressed doubts as to the Union's majority status, the Company discussed wages, union security, the re-employment of strikers, and appeared to take the Union proposals under consideration. They agreed to meet in the future. At the March 11 meeting the Company again discussed with the Union the differences between them, chief among these being the issue of union security and the re-employment of strikers, both of which were opposed by the Company. The correspondence through the month of March continued to demonstrate a genuine difference of opinion, especially as to the treatment of the striking employes. The Company reiterated its willingness to continue discussing these issues. After a canceled meeting this willingness culminated in

**318**

the meeting of April 24, 1964, where the Union relinquished all demands. The Trial Examiner commented on these negotiations:

"It seems to me, in the instant case, that it cannot be said that the Respondent 'carried on its affairs, conducted its business and managed the employees without regard to any consideration of the employees' chosen representative.'"

The evidence, we believe, is clear. Although the Company was certainly entertaining doubts as to the majority status of the Union it continued to meet and to bargain with the Union as the sole representative of its employees. We find no substantial evidence in the record that would indicate these negotiations were not conducted in good faith. Therefore, at least until the letter of April 25, 1964 the Company was negotiating as the law required.

The Board has made much of the fact that the Company refused to accept the reduced proposals of the Union and withdrew its prior offers made during earlier negotiations, indicating this was evidence of the Company's bad faith. This argument ignores the well established proposition that the law does not require one party to yield to the proposals made by the other party. N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); N.L.R.B. v. H. E. Fletcher Co., 298 F.2d 594, 602 (1 Cir. 1962). The Board may not sit in judgment on the reasonableness of the Union proposals or in the unreasonableness of the Company's action in rejecting them. N.L.R.B. v. American National Insurance Co., supra; N.L.R.B. v. Herman Sausage Co., Inc., 275 F.2d 229, 231 (5 Cir. 1960); N.L.R.B. v. Yutana Barge Lines, Inc., 315 F.2d 524, 528 (9 Cir. 1963); N.L.R.B. v. Wonder State Manufacturing Company, 344 F.2d 210, 215 (8 Cir. 1965). As long as it is in good faith the Company may bargain as hard as it wishes, and the mere inability to reach an agreement in no way indicates a failure to bargain in good faith. N.L.R.B. v.

Clegg, 304 F.2d 168, 176, 100 A.L.R.2d 1269 (8 Cir. 1962).

In the present case it was apparent to all parties that the Union had lost the economic strike and its position had so deteriorated that it no longer had the strength to deal with the Company on a competitive basis. In such a situation it is only natural that the Company, sensing its strong position, will bargain with increasing toughness and will be less inclined to make concessions to the Union. The Company had a right to withdraw its proposals of the prior summer and had a right to reject propositions which it felt inimical to its best interest. It was within its rights and should not be condemned for so acting. N.L.R.B. v. Hart Cotton Mills, Inc., 190 F.2d 964 (4 Cir. 1951); N.L.R.B. v. Landis Tool Co., 193 F.2d 279 (3 Cir. 1951); N.L.R.B. v. Wonder State Manufacturing Company, supra; Perfect Service Gas Company, Inc., 146 NLRB 1686 (1964).

Though the Board is entitled to draw inferences from the evidence, before these inferences are entitled to acceptance by the courts they must be reasonably founded upon proved facts and not upon suspicion or speculation. N.L.R.B. v. Sheboygan Chair Co., 125 F.2d 436 (7 Cir. 1942); N.L.R.B. v. J. L. Brandeis & Sons, 145 F.2d 556 (8 Cir. 1944), cert. denied 323 U.S. 751, 65 S.Ct. 85, 89 L.Ed. 601; N.L.R.B. v. F. H. McGraw & Co., 206 F.2d 635 (6 Cir. 1953); N.L.R.B. v. Putnam Tool Company, 290 F.2d 663 (6 Cir. 1961). It is our conclusion that the facts in this case are, in law, not capable of giving rise to the inference drawn by the Board. The abstract doubts as to majority status and the inability to reach an agreement are not enough, standing alone and in the face of many contrary indications, to support the inference that the Company was not bargaining in good faith from the meeting of February 18, 1964 through the meeting of April 24, 1964.

The Board must, of course, start with the well known presumption of

lawful conduct, a presumption that the parties were conducting themselves in good faith according to the dictates of the law. The burden of proving any wrongdoing is then placed upon the General Counsel for the Board. In overcoming the presumption of lawful conduct the General Counsel is not at liberty to assume wrongdoing or engage in guesswork or speculation as to guilt, and the Board's ruling must be based upon facts or inferences properly deducible from the facts. The inference of guilt drawn herein we do not believe can be properly deduced from the facts in the record. Therefore, the Board's conclusion of unlawful conduct during these approximate two months of negotiations must be supported only by its own suspicions and speculations. An order with such support is not entitled to judicial enforcement.

Having concluded that the Company bargained in good faith until April 25, 1964, the problem is now, could they at this date refuse to bargain further on the basis of a lack of majority standing of the Union?

 It is the position of the Board that the refusal to bargain some eleven days prior to the end of the "certification year" amounts to a *per se* unfair labor practice absent circumstances not here present. We cannot accept this position. The Board's own rule is not an absolute, black letter one calendar year. N.L.R.B. v. Satilla Rural Electric Membership Corporation, 322 F.2d 251, 253 (5 Cir. 1963). Rather the Board requires negotiation for "a reasonable period—about one year." The Supreme Court expressed it as, "a 'reasonable' period, ordinarily 'one year.'" In other words the parties are required to bargain for a "reasonable period" without formally challenging the majority status of the Union. N.L.R.B. v. Clegg, supra; N.L.R.B. v. H. E. Fletcher Co., 298 F.2d 594 (1 Cir. 1962). The Board and the Supreme Court consider "about one year" to be reasonable absent "unusual circumstances" that could considerably shorten the period. Brooks v. N.L.R.B., supra.

 Having bargained until only eleven days prior to the end of the certification year, clearly the Company bargained for "about one year", and under the circumstances of this case we believe this to be a "reasonable period."

After the certification, the parties met and reached agreement on many propositions, but disagreement resulted in an economic strike, which was the Union's prerogative. As was its right, the Company began permanently replacing striking employees. Violence on the picket line resulted in court action, contempt citations, and unfair labor practice charges. Nonetheless, the parties met separately with a Federal Mediator about one month after the strike. The Mediator determined that a genuine impasse had been reached, primarily due to the Union's uncompromising position. Thereafter, for over three months the Union made no apparent move to reopen negotiations. In fact, it was the Company that initiated resumption of negotiations with its letter of November 30th. The Company suggested an earlier meeting date which was unacceptable to the Union, and the Union canceled a meeting set on February 14, 1964. All the while the Company cooperated fully in setting up the meetings. The parties met on February 18, March 11, and April 24, 1964. Between these meetings they exchanged correspondence indicating their respective positions. We believe this to be bargaining for a reasonable time. The Union has been given a reasonable opportunity to come to an agreement. Any failure to have more meetings during this year cannot be blamed on the Company reluctance or unwillingness to negotiate.

In addition to the fact that the Company bargained for "a reasonable time—about one year" we feel the "unusual circumstances" present in this case justified the Company's refusal to bargain following the April 24, 1964 meeting.

 Clearly, "unusual circumstances" will justify a company in challenging the majority status of the Union any time during the certification year.

The *Brooks* opinion set out three sets of "unusual circumstances",[5] none of which are applicable here, in which challenge was allowed. We do not believe, however, that the Court was using "unusual circumstances" as a term of art intended to cover only the enumerated situations. They were illustrative examples only of varied situations, which might justify a formal challenge of a Union's majority position. We accept the Board's premise and contention that the permanent replacement of economic strikers is not an "unusual circumstance" that would justify a refusal to bargain in good faith with the Union during the certification year. N.L.R.B. v. Reliance Clay Products Company, 245 F.2d 599 (5 Cir. 1957). Further, the Union's insistence in trying to advance the cause of the strikers as opposed to the replacement employees is not, in itself, a reason to repudiate the Union during the certification year.

It is important, however, to remember that from the time of the February 18th meeting until the final meeting of April 24th, the Union had insisted that the striking employees replace the presently working employees. The Union had expressly stated that it was not interested in representing the strike breakers and was only interested in its own people, which, of course, is a natural reaction in a situation of this type. The Union could not, as a practical matter, be expected to afford good faith representation in behalf of the strike breakers. We recognize the anomalous position of the Union in being obligated by law to represent the strike breakers along with the Union employees whom they had totally replaced. The Union's position was untenable. It could not fairly represent both groups.

 Nonetheless, we feel that the Union's proposals on April 24, 1964 indicated that it was representing none of the members of the unit. During the preceding months the Union had made it clear that it was not representing the strike breaking employees. On April 24th, however, it clearly abandoned the cause of the Union members by relinquishing any demand for union security, re-employment of the striking workers or even preferential hiring of the strikers on future vacancies. The Union, in giving the Company a blank check to write any type of contract covering the employees in the bargaining unit, in whom it admittedly had no personal interest or concern whatsoever, and in whom it could not afford good faith representation, did in effect abandon representation of the striking members to which it owed primary responsibility. In giving the Company a blank check to determine on an *ex parte* basis the wages, hours, and working conditions of all employees, the Union was obviously no longer representing any of the members of the unit. It apparently was interested only in forestalling a representation election that could be demanded within a matter of days. This nearness to the end of the year, this abandonment of the strikers to whom the Union owed original loyalty, this abandonment of all workers it was bound by law to represent, simply to secure a contract, any contract, was not lost on the parties who viewed it in a practical light. At this late hour the Company was justified in refusing to negotiate with a Union that so patently represented none of the members of the bargaining unit. The Trial Examiner summarized our feeling herein:

"Here, those employees on the payroll as of the certification date all ultimately lost their jobs when they all were replaced and when they lost the strike; and, because the Union continued to represent the strikers and did not claim to represent the replacements in the bargaining unit, the Respondent was not precluded from con-

---

5. The three situations are:
 "(1) The certified union dissolved or became defunct; (2) as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international; (3) the size of the bargaining unit fluctuated radically within a short time."

tinuing to conduct its business as it did."

To summarize, while the Company's conduct is not exemplary of the highest ideals of the collective bargaining process, its activities should not be viewed in complete isolation. The negotiations of the Company must be measured in the light of surrounding circumstances, which include corresponding attempts at good faith negotiation by the Union. A union cannot charge an employer with refusal to negotiate when it has made no attempts to bring the employer to the bargaining table. N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939); N.L.R.B. v. Rural Electric Company, Inc., 296 F.2d 523 (10 Cir. 1961). Nor is a union in a good position to charge an employer with bargaining in bad faith when the union itself has exhibited little, if any, real desire to reach a bona fide contract benefitting the members of the bargaining unit which it, by law, is required to represent. Viewing the entire course of these negotiations before us, the Company throughout has exhibited a general willingness to meet, discuss, and resolve the issues. This apparent willingness on the part of the Company has been at least equal to, if not greater than, the willingness of the Union to meet with the Company and negotiate a contract as a representative of the members of the unit. The First Circuit in N.L.R.B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1953), cert. denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 stated:

" * * * [T]he question is whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible, or that it bargained in good faith but was unable to arrive at an acceptable agreement with the union."

In looking at the totality of the Company's conduct and that of the Union's we do not think that under the context of this case it can be said that the Company refused to bargain in good faith. It did meet and negotiate until the meeting of April 24, 1964, and the Board's finding that these negotiations were not in good faith finds no substantial support on the record. Lacking only eleven days from an entire calendar year, we believe this to be negotiation for a "reasonable period" of time as contemplated by law. The nearness to the end of the certification year, the lethargic approach of the Union during the preceding eight months and last minute unilateral abandonment of the members of the bargaining unit, we believe constitute an "unusual circumstance" that would relieve the Company of further bargaining during the remaining eleven days of the certification period.

The Board's Order required the Company to "upon request to bargain with the Union as the exclusive representative of the employees in the appropriate unit * * *." To contend that the Union can at almost the end of a certification year effectively and in good faith represent a group of individuals, which it has been trying to have relieved of their jobs, is unrealistic and is not in furtherance of promoting industrial tranquility. See, Perry Coal Company v. N.L.R.B., 291 F. 2d 126 (7 Cir. 1961). Actually the Union has been given a sufficient period of time, almost a year, within which to reach an accord with the Company and under the circumstances the rational basis of the one-year certification rule appears to be satisfied.

Enforcement denied.