## AMERICAN RUBBER PRODUCTS CORP.

v.

## NATIONAL LABOR RELATIONS BOARD.

### No. 10990.

United States Court of Appeals, Seventh Circuit.

June 18, 1954.

T. C. Kammholz, N. E. Anderson, Chicago, Ill., Norman H. Sallwasser, La Porte, Ind., Henry M. Thullen, Chicago, Ill., for petitioner, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., of counsel.

George J. Bott, Gen. Counsel, Arnold Ordman, Franklin C. Milliken, Attys., David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

A petition was filed here pursuant to section 10(f) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., by American Rubber Products Corporation, hereinafter called petitioner, to review and set aside an order of the National Labor Relations Board issued against the petitioner July 10, 1953. In its answer to the petition the Board has requested enforcement of its order. It is not denied that petitioner at all relevant times has been a manufacturer subject to the National Labor Relations Act.

The complaint was issued upon a charge filed by United Electrical, Radio and Machine Workers of America, Local 914, hereinafter called the union, a labor organization within the meaning of section 2(5) of the act.

From the evidence in the record it appears that the series of events leading up to the present controversy began on January 15, 1952, when the union called a strike at petitioner's plant. On the following day the union informed petitioner that it represented a majority of petitioner's employees and demanded that petitioner recognize it as the collective bargaining representative of the employees. On January 21, 1952, petitioner granted the union recognition as bargaining agent by executing a formal agreement with it. On the same day, the union agreed to call off the strike and petitioner's employees returned to work on January 22, 1952. Thereafter, the parties submitted contract proposals to each other and commenced a series of collective bargaining conferences, meeting two or three times each week. During these meetings agreement was reached in respect to the bargaining unit, scope of the agreement, recognition, union shop and .check-off of dues, shop representation, grievance procedure, time off with pay for union representatives, suspension and discharge, hours of work, overtime and holiday pay, general working conditions, seniority, vacations, time off for elections, military service, furloughs and leaves of absence, and wages for female employees. On April 14, 1952, however, petitioner and the union reached an impasse on the question of a wage increase for male employees. Petitioner advised the union that wage increases for male employees could not be granted without prior approval by the Wage Stabilization Board. Nevertheless, the union insisted that male employees be given a wage increase immediately, rejected other proposals of petitioner, and stated that, unless petitioner agreed to an immediate increase, the union would launch a strike in accordance with a

strike vote previously taken by the union membership. Petitioner declined the union's demands and the employees went on strike on that same day.

On April 28, 1952, May 14, 1952, and June 4, 1952, the union requested that petitioner resume bargaining negotiations. Petitioner refused stating among other things that it doubted that the union represented a majority of the employees. During the strike, in April, May, and June, 1952, two employees whom the Board found to be supervisors within the meaning of the act contacted certain other employees and attempted to persuade them to abandon the strike, return to work, give up their membership in the union, and withdraw their designation of the union as their statutory representative. These attempts were accompanied by promises of benefit and threats of reprisal.

The complaint, issued August 6, 1952, alleged in substance that (1) about January 21, 1952, a majority of petitioner's employees selected the union as their bargaining representative, (2) about January 21, 1952, petitioner recognized the union as exclusive representative of its employees, (3) about April 12 (*sic*), 1952, petitioner's employees went on strike, and (4) since about April 12 (*sic*), 1952, petitioner has refused to bargain collectively with the union in violation of section 8(a) (1) and (5) of the act,[1] and, by the acts of two of its supervisory employees, has interfered with, restrained, and coerced its employees in violation of the same sections. Petitioner by its answer denied the commission of any unfair labor practice, set forth certain affirmative defenses, and questioned the union's compliance with section 9(h) of the act which requires union officers to file non-communist affidavits with the Board.

A hearing was held on August 19 and 20, 1952, at which time the strike was still in progress. The trial examiner found that the strike was called to enforce the union's demand for an immediate wage increase which, if granted, would have been in violation of the regulations of the Wage Stabilization act. He thereupon concluded that petitioner's duty to bargain was suspended for the duration of the strike and that petitioner had not violated section 8(a) (5) of the National Labor Relations act, since the strike was called for an unlawful purpose and was therefore unprotected concerted activity. Having disposed of the refusal to bargain charge on these grounds, the trial examiner did not consider petitioner's other defenses to that charge. As to the activities of petitioner's two supervisory employees during the strike, the trial examiner found that by such activities petitioner interfered with, restrained, and coerced its employees in violation of section 8(a) (1) of the act, but not in violation of section 8(a) (5) thereof.

The Board adopted the trial examiner's finding that the strike was called by the union for the purpose of compelling petitioner to grant an immediate wage increase and adopted his findings of credibility. Contrary to the trial examiner, however, the Board held that petitioner was obligated to bargain with the union on and after April 14, 1952, since there was "no probative evidence to show that the strike, presumptively a protected concerted activity, was unlawful, nor in fact, that the Respondent[2] refused to bargain because it believed the strike to be unlawful". The Board also held that there was no

[1]. Sec. 8(a) (1) and (5) [sec. 158, title 29 U.S.C.A.] reads:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

[2]. Petitioner here.

merit in petitioner's contentions that it was relieved of its obligation to bargain with the union on the grounds that (1) there was no request to bargain in an appropriate unit because the union requested the inclusion of watchmen in the unit; (2) the union itself did not bargain in good faith; and (3) the petitioner in good faith doubted the union's majority status. The Board therefore found that petitioner refused to bargain with the union in violation of section 8(a) (1) and (5) of the act, and that the activities of the two supervisors were violative of the same sections.

1. Is there substantial evidence in the record, considered as a whole,[3] to support the finding of the Board that the strike of April 14, 1952, was protected concerted activity which did not relieve petitioner of its obligation to bargain with the union?

■ If the granting of an immediate wage increase to petitioner's male employees would have violated Wage Stabilization Board rules, the strike was unlawful and petitioner's refusal to bargain with the union thereafter was not an unfair labor practice. N. L. R. B. v. Indiana Desk Co., 7 Cir., 149 F.2d 987.

The only evidence concerning the legality of such wage increase is the testimony of P. G. Torosian, vice-president and treasurer of petitioner. On direct examination as a witness for petitioner, he testified that prior to April 14, 1952, company auditors had made an examination of petitioner's pay adjustments for the purpose of determining whether or not, under the existing federal wages and salary stabilization regulations, the company was allowed to make any more adjustments in men's rates without prior Stabilization Board approval. He was allowed to state, over objection, that the auditor had then advised him that the company could not grant · a wage increase to male employees with-

out first getting Stabilization Board approval. Later, he was again permitted to state without objection that the auditor had so advised him. On cross-examination by counsel for the union he also testified, without objection by Board counsel or petitioner's counsel, that the auditor informed him by letter that a wage increase for male employees could not be granted without prior approval from the Stabilization Board. There is no evidence in the record tending to contradict Torosian's testimony, nor is there any evidence tending to show that Stabilization Board approval was not necessary before petitioner could grant a wage increase to male employees. The Board, however, in its decision and order, stated that Torosian's testimony was "obviously hearsay" and ruled that such testimony had "no probative value to establish the *fact* that the granting of wage increases would actually have violated WSB rules" and hence "there is no evidence whatsoever on which the Board could make an independent finding as to the legality under WSB rules of the increase demanded by the union". Petitioner thereupon moved for leave to introduce additional evidence in support of its contention that such a wage increase could not lawfully have been granted. This motion was denied.

We are of the opinion that the Board erred in holding Torosian's evidence lacked probative value to show that the demanded increase could not lawfully have been granted immediately. Torosian's testimony, although it was hearsay, was uncontradicted. His evidence on direct examination was admitted without objection by counsel for the union and the Board, except in one instance, when a single objection by the Board's counsel was made, overruled and not renewed. At the commencement of the hearing before the trial examiner, he stated that he would allow, upon appropriate order, an objection to stand to an entire line of questioning.

3. 29 U.S.C.A. § 160; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

No such order was requested or obtained in regard to the line of questioning now under consideration although counsel for the Board did at other stages of the proceedings procure such orders. Moreover, on cross-examination of Torosian by counsel for the union, similar evidence in regard to the necessity of Stabilization Board approval was elicited without any objection from counsel for the Labor Board.

■ Hearsay evidence admitted without objection must be considered and given its natural probative effect. As the Supreme Court stated in Diaz v. U. S., 223 U.S. 442, 450, 32 S.Ct. 250, 252, 56 L.Ed. 500, " * * * So, of the fact that it was hearsay, it suffices to observe that when evidence of that character is admitted without objection, it is to be considered and given its natural probative effect as if it were in law admissible".

The Board relies heavily on Willapoint Oysters, Inc., v. Ewing, 9 Cir., 174 F.2d 676, 691, where the court stated that an agency's findings, to be valid, cannot be based on hearsay alone. To the same effect, the Board cites N. L. R. B. v. Ford Motor Co., 6 Cir., 114 F.2d 905, 915, and Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 230, 59 S. Ct. 206, 83 L.Ed. 126. Although such statements, standing alone, might appear to support the Board's contention that the hearsay evidence in the instant case was insufficient upon which to base a finding that an immediate wage increase would have been unlawful, when viewed in context they are inapplicable to the case at bar. In the Willapoint case, there was considerable direct evidence supporting the respective contentions of both opposing parties. Certain hearsay evidence in support of the contention which was upheld by the administrative agency, had been admitted over objection. On review, the court held that the receipt of such evidence over objection was no cause for reversal of the administrative order since it was also supported by substantial direct evidence. To the same effect is the Consolidated Edison Co. case. In the Ford Motor Co. case, the National Labor Relations Board found that one of Ford's employees had been discriminatorily discharged. The only evidence to support this finding was hearsay evidence, which was contradicted by credible direct evidence. The court held that the Board's finding was not supported by substantial evidence.

■ It is apparent that, since the evidence was conflicting in the foregoing cases, they actually support only the proposition that hearsay evidence alone, if contradicted by clearly admissible direct evidence, is insufficient to support a finding. In the case at bar, however, no evidence was offered to contradict the hearsay evidence which was admitted without objection and which tended to prove that an increase in wages could not lawfully have been put into effect without prior approval of the Stabilization Board. We accordingly hold that that fact was proved by substantial evidence and approve the conclusion of the trial examiner that "so far as this record shows", the strike was called to compel an immediate wage increase, the granting of which would have violated WSB regulations, the strike was not a protected concerted activity, and for that reason petitioner was under no obligation to bargain with the union thereafter.

2. Petitioner also contends that it was justified in refusing to bargain with the union on and after April 14, 1952, for the additional reason that it, in good faith, then doubted that the union represented a majority of the employees. But the Board could find no merit in this defense.

Whether or not petitioner is to be believed, when it says that, in good faith, it then doubted the union's majority status and gave that as the reason for refusing to bargain with the union, requires an examination of the pertinent facts in evidence. Petitioner's witness Torosian testified without objection that three different employees in late March or early April, 1952, engaged

him in conversation and told him that they had signed cards for the union after being told in January that they could either "sign or be laid up in the hospital". There were other employees who talked to Torosian about the same matter. Torosian testified that he had found out in the late part of March or the first part of April that "there were a lot of employees" who wanted another union.

Eugene Chalik, the vice-president of petitioner, testified that he had told George Rich, a striking employee, who testified as a witness on behalf of the General Counsel of the Board, when Rich asked him if he would recognize the striking union, that "we had no objections to a union that represented a majority of the workers, whether it be C.I.O., or the A.F.L., or the U.E." Rich did not deny this statement.

After the strike started on April 14, 1952, the federal conciliator, Ralston, was told by Torosian that he "did not know what there was to bargain", because he "didn't think the union represented the majority". A month after the strike started, Sheehan, representing the union, asked Torosian to bargain on a contract and Torosian stated that he did not believe that Sheehan represented a majority.

While the statements made by these comparatively few employees, evidencing that they were not in sympathy with the union's strike activity, standing alone, may have been sufficient to raise a reasonable doubt in the mind of petitioner as the then majority status of the union, N. L. R. B. v. James Thompson & Co., 2 Cir., 208 F.2d 743, we simply consider that evidence against the background of the union's activity from the time it called the January strike. On January 15, 1952, without a prior request for recognition or bargaining or other communication of any kind from the union, a strike was called at petitioner's plant. The first demand for negotiation by the union was a telegram sent after the strike had begun.

The union and petitioner met on January 21, 1952, when the union claimed that a majority of the employees had signed membership cards. Without further proof of majority status, petitioner accepted the union's statement, no election was held and a formal agreement was entered between the union and petitioner, ending the strike and providing that all employees thereafter were required to maintain membership in the union in order to retain their jobs. The agreement contemplated further bargaining on all other matters. During the subsequent bargaining meetings each side submitted its contract proposals. All of petitioner's proposals were refused by the union and the proposals of the union for wage increases for female employees and its other proposals were agreed to, except wage increases for male employees and some minor matters, which remained unsettled on April 14, 1952. The main unresolved issue concerned wage increases for male employees. The agreement for increases ranging from 15 cents to 25 cents an hour for female employees affected more than one-half of petitioner's work force. During the bargaining and on April 14, 1952, petitioner advised the union that it could not grant a wage increase to its male employees without approval by the Wage Stabilization Board. On the latter date a member of the union committee stated that "you grant us the increase and we will worry about that afterwards". On that same day the union demanded an immediate wage increase for the male employees, it having previously authorized a strike if such increase was not agreed upon and made effective "on that date". Petitioner offered the union increases based upon a cost-of-living escalator provision, or an incentive plan instead of the flat hourly rates, either of which could be made effective without prior approval by the Wage Stabilization Board. The union rejected these proposals, demanded an immediate hourly wage increase,

54

and sought to compel compliance by calling a strike to take effect on April 14, 1952.

At the time that the complaint was issued by the Board against petitioner on August 6, 1952, the strike was still in progress.

■ The conduct of the union leaders in suddenly calling a strike in January, without any prior demand for negotiations or recognition, followed by the highhanded manner of calling the employees out on a strike on April 14, 1952, to force an immediate wage increase for men without the necessary Stabilization Board approval, must have been known to the plant employees. Serious economic losses occur to striking employees. The strike weapon is one which, when used properly, is a powerful instrument for employees to use in forcing recognition of their rights by an employer. However, a strike is but a means to an end. Unions do not exist for the mere purpose of calling strikes. Unless it appears that satisfactory results cannot be attained by conciliatory efforts, a strike is not economically justified. When misused as a weapon of coercion by headstrong and hotheaded union leaders it inflicts damage not only upon an employer and the public but also upon striking employees and their families. The precipitate, arbitrary as well as illegal action of the union leaders, as shown by the record before us, in calling two strikes upon a moment's notice in one plant within a period of less than 90 days, is patently an abuse of power and harmful to the employees themselves. It would be surprising if such conduct would meet with the approval of any group of American workmen. Even if there was no direct evidence of statements by employees, such as we have in this case, expressing disapproval with the union leadership, it would appear that the inferences deducible from this record might well justify a reasonable doubt in the mind of the petitioner as to the validity of the union's claim that it on April 14, 1952 and thereafter represented a majority of the employees. We believe that it did entertain such doubt and that the doubt was entertained in good faith. For that reason we think that the Board erred in finding to the contrary.

■ Either one of the two foregoing defenses alone, the illegality of the strike or petitioner's good faith doubt as to the union's majority status, is sufficient to support a holding that petitioner did not violate section 8(a) (5) by its refusal to bargain.

Having found that petitioner was justified in refusing to bargain with the union for the aforesaid reasons, we find it unnecessary to consider petitioner's other defenses to the refusal to bargain charge.

■ 3. As to the conduct during the strike of petitioner's two supervisory employees, foremen Stayback and Miller, the evidence is uncontradicted that they solicited other employees to abandon their union adherence and return to work and that this solicitation was accompanied by threats of reprisal and promises of benefit. The Board was correct in holding that this coercive solicitation of individual employees while the strike was in progress was a violation of section 8(a) (1) of the act. N. L. R. B. v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676, 681, 146 A. L.R. 1045. There is no merit in petitioner's contention that this solicitation was not attributable to petitioner since it was "without the knowledge, consent, approval or authorization of petitioner". The record contains ample evidence to support the finding that both men "occupied positions of authority and thus represented the company". N. L. R. B. v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, 757–758, and N. L. R. B. v. Geigy Co., 9 Cir., 211 F.2d 553, 557. Since petitioner was under no obligation to bargain, however, the Board's finding that the conduct of the foremen "was calculated to undermine the Union's right to act as the collective bargaining representative of (petition-

er's) employees and therefore was also violative of Section 8(a) (5) of the Act" cannot be sustained. We find, therefore, that by such solicitation petitioner violated Section 8(a) (1) only, and not Section 8(a) (5).

4. Petitioner contended before the Board and now contends that one Sheehan, a union representative, "dominated and controlled" the union and was an officer or at least a *de facto* officer of the union, but had not filed a non-communist affidavit as required by section 9 (h) of the act. As to this contention the Board stated:

> "Following an independent administrative investigation, the Board is satisfied that Sheehan is not an officer of the Union, either in a *de facto* capacity or otherwise, and that the Union is, and has been, in full compliance at all times material herein."

 In the case at bar, it is conceded that the union was required to comply within the meaning of the act. Thus, petitioner here seeks to question only the *fact* of compliance as distinguished from the *necessity* of compliance, which was the issue involved in N. L. R. B. v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969. This question of fact was a matter for the Board's own administrative determination and was not a matter which petitioner was entitled to raise and litigate in an unfair labor practice proceeding. N. L. R. B. v. Sharples Chemicals, Inc., 6 Cir., 209 F.2d 645; N. L. R. B. v. Louisville Container Corp., 6 Cir., 209 F.2d 654; N. L. R. B. v. Greensboro Coca-Cola Bottling Co., 4 Cir., 180 F.2d 840.

It should also be noted that the "fronting" cases relied on by petitioner (N. L. R. B. v. Happ Bros. Co., 5 Cir., 196 F.2d 195; Sun Company of San Bernardino, 103 N.L.R.B. No. 36) are not applicable here. In those cases, the charge was filed by an individual and the respondent was permitted to litigate the question of whether such filing was a mere "sham" and the charging party no more than a "front" for a labor organization which was barred by non-compliance from filing in its own behalf. Such cases are clearly distinguishable from the instant case where the union is the charging party and the sole issue is the litigability at petitioner's instance of the compliance status of said union.

 Petitioner also contends that it was denied due process of law by the Board's refusal to permit the introduction of evidence on the issue of compliance. In its Decision and Order, the Board expressly recites that it has made an independent administrative investigation of the union's compliance status and has fully considered the precise claim made by petitioner. Thus petitioner has obtained the full measure of relief which Congress has provided and its claim of deprivation of due process cannot be sustained. Congress may delegate to an administrative body the power to find or determine some fact or situation on which the operation of a law is conditioned. Varney v. Warehime, 6 Cir., 147 F.2d 238, 244.

For the foregoing reasons, the portion of the Board's order commanding petitioner to cease and desist from "attempting by promise of benefit or threat of reprisal to induce its employees to abandon their strike and repudiate United Electrical, Radio & Machine Workers of America, Local 914, or any other labor organization as their statutory representative and to designate any organization as such representative" will be enforced. In all other respects, the order of the Board is hereby set aside.