**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Mark R. CLEGG and Mary M. Clegg, d/b/a Clegg Machine Works, Respondents.**

**No. 16712.**

United States Court of Appeals
Eighth Circuit.

June 20, 1962.

Rehearing Denied Aug. 3, 1962.

Russell Spector, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate-Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Rosanna A. Blake and Vincent W. Bradley, Attys., N. L. R. B., Washington, D. C., on the brief, for petitioner.

Harry L. Browne, Kansas City, Mo., James R. Willard, of Spencer, Fane, Britt & Browne, Kansas City, Mo., with him on the brief, for respondents.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

In this case, concerning four employees, the National Labor Relations Board seeks enforcement of its order against Mark R. Clegg and Mary M. Clegg, doing business as Clegg Machine Works in North Kansas City, Missouri. The board concluded, 129 NLRB No. 154, that the company had violated §§ 8(a) (2) and 8(a) (5), and consequently § 8(a) (1), of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (2), (5) and (1).[1] Specifically, the Board found that the company had failed to bargain collectively in good faith with District Lodge No. 71, International Association of Machinists, AFL–CIO, and had dominated a rival independent union, Local No. 1, Clegg's Independent Machinists.

*Background.* Mark and Mary Clegg are husband and wife. As partners they own and operate the small machine shop known as Clegg Machine Works. Mary does the typing, clerical and other office work. Mark manages the business. Their son Robert works in the shop.

The company was founded about 1941. In 1952 IAM attempted to organize the shop but lost the election. In August 1953 IAM picketed the place. The company thereupon recognized that union and its first labor contract was signed. This came about without an election. IAM, therefore, was not a certified union at the Clegg plant. The contract contained a union shop clause. Other similar contracts were successively executed over the years. The last of these was to expire on July 31, 1959.

About that time the company employed five persons other than the three Cleggs. They were:

Albur James, welder and shop steward;

Ira Jones, machinist;

Claude Hamilton, turret lathe operator;

Harold Fensenmeyer, turret lathe operator;

Orvid Jones, machine operator or helper and son of Ira.

All five were members of IAM. Young Clegg did not belong to the union; being a son of the owners, he was not an "employee" under § 2(3) of the Act, 29 U.S. C.A. § 152(3). The present dispute concerns only Hamilton, Fensenmeyer, and the two Joneses, for James voluntarily terminated his employment[2] around July 23, 1959.

1. "(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title".

2. No claim is made that James was discriminatorily discharged.

*The negotiations.* In May 1959 IAM notified the company that it wished to negotiate a new contract. On June 15 a first meeting took place between Mark Clegg and two union representatives, Fay and Weber; neither steward James nor any other employee was present. At this meeting the union made a wage demand and a request for information as to the employees' rates of pay. As to the wage demand: Fay testified that he asked for a 30¢ per hour raise for Jones, the company's only first class machinist, in order to bring the contract up to the "going" rate of $2.97 per hour, and for a 20¢ per hour raise for the other employees. Clegg testified that Fay's demand at this time was for a 30¢ per hour increase across the board. He countered with an offer of 10¢ for all employees. Neither side moved from its position. As to the wage information sought by the Union: Clegg revealed the current rate of pay of all employees except Ira Jones. He said that he would rather not tell about Ira's rate because it was a "trade secret" and a matter between himself and Jones.

A second brief meeting between the union representatives and Clegg took place in late June or early July when Fay and Weber, without prior notice, called on Clegg. Fay testified that Clegg then "told us that he offered the ten cents and that was all that he would give, he wouldn't give another penny. We could take that or else. He said he didn't have time to talk to us and he turned around and walked away from us". Clegg testified, "I restated my offer of ten cents and Mr. Fay said it was wholly unacceptable and that there would be a strike and we would be deadlocked and so on if I didn't increase it". Neither side gave ground and that meeting, too, ended with no progress. Fay testified that immediately following this second meeting he went out into the shop and saw the employees and that they asked him to stand by the 20¢ figure. Fensenmeyer, on the other hand, as a witness for the General Counsel, testified that it was James who had talked to him

and had asked what he thought about holding out for 30¢ or for 20¢ and that he answered that the latter was all right with him. Orvid Jones, as a witness for the General Counsel, and Ira Jones, as a witness for the company, both denied that a new contract had ever been discussed at any such meeting.

About July 10, Fay sought the assistance of the Federal Mediation and Conciliation Service. On July 14 Mediator Griffith met with Fay and Clegg. On this occasion Fay again told Clegg what IAM wanted by way of wage increases and Clegg again offered 10¢. Fay repeated his request for information as to Jones' rate of pay and Clegg repeated his refusal. Fay also asserted that young Clegg should belong to the union but Clegg replied that his son would never belong to it. That meeting ended with no agreement. Except for a telephone call to Clegg from Griffith, nothing further took place before the contract expired on July 31. Griffith, who evidently went on vacation about this time, called Clegg again on August 3. Clegg then told Griffith that IAM no longer represented the employees, that he would not meet further with their representatives, that he was withdrawing his 10¢ offer, and that Mrs. Clegg had filed a representation petition with the Board that very day.

*The emergence of CIM.* During these negotiations certain of the employees entertained some disenchantment with IAM. Ira Jones, who had been an IAM member for about twenty-one years and who apparently took the leading role in the independent union discussions, testified that this was due (a) to the failure of the union to communicate with the employees during the negotiations, James telling him, after a call to Weber at the union office, "Weber told me that we didn't have anything to say in the matter, it was strictly up to them", and (b) to a written demand by the union for payment by August 1 of all back dues owed by Clegg employees. Hamilton, Orvid Jones and Fensenmeyer, the other qualified employees involved, all testified

as to the existence of talk of an independent union. Fay testified that twice during the negotiations he had called James to assemble the men for a meeting; that these meetings never developed; that the first failed because one of the men would be unable to get his ride home that night out into the country; and that the second failed because, as James told him, "I don't think the boys want to come to a meeting because Jones wants to be at the meeting and I don't think they want to be in a meeting where Jones is because he carries everything back to Clegg". Fay conceded, however, that "at one time James told me that the boys were dissatisfied and that they were talking of getting an independent union". Fay went on to assert that he did not know why the men failed to show up at the one meeting, that it had not come to his notice that the men were dissatisfied and that he never declined to meet with them as a group.

Ira Jones testified that during the first two days of August the employees held discussions concerning the formation of an independent union and withdrawal from IAM; that neither of the Cleggs knew anything of this at that time; that the men decided that they definitely wanted their own union; that he "was more or less appointed to inform Mr. Clegg that we were going to form a union of our own"; that he so advised Clegg; that Clegg said there wasn't anything he could do about it; that a day or so later he told Clegg that this was now definite; that the men, with the exception of the absent Orvid Jones, had voted to name him as bargaining agent "and asked him to type up some kind of a something, whatever was necessary to start such a union"; and that Clegg said he would ask Mary to type something up. Clegg confirmed this in his testimony and said that on the morning of August 3 Jones asked for his help in drafting a document to organize an independent union and that he asked his wife to prepare a rough draft.

Mrs. Clegg, who testified that the employees had often asked her to do personal favors for them that required typing, such as income tax returns, prepared a first draft upon her husband's explanation of what Jones wanted. Jones was named as bargaining agent and treasurer; the name "Clegg's Independent Machinists" was given to the organization (apparently suggested by either Clegg or Mrs. Clegg); and dues were specified at 50¢ per month at Clegg's suggestion that some amount be specified in the document so as to be there for change in a later draft. When she finished the typing Robert Clegg was in the office and at her request took it to Jones. Jones testified that he showed it to the men and suggested that they make the dues $2.00 per month; that they agreed; and that this was the only change. Mrs. Clegg, however, testified that there were other changes. In any event, the paper was retyped by Mrs. Clegg and returned to Jones on August 3. It was then signed by Jones and young Clegg. Jones showed it to Fensenmeyer who refused to sign because he wanted to avoid taking sides. Clegg also showed it to Fensenmeyer as he went by the latter's lathe after having talked to Jones. Fensenmeyer testified, "I mentioned the fact that I didn't feel like I wanted to sign it, and Mr. Clegg told me that he didn't intend to ask me to sign it in any way, shape, or form, he just merely stopped there and showed it to me". The other two employees, Orvid Jones and Hamilton, were not at work on that day. Hamilton returned the next day, August 4, and signed. He testified that he did so voluntarily and without pressure from Jones or from the company; he also said that when he then saw the paper it was the first knowledge he had that Jones was to be the bargaining agent. Orvid Jones returned to work from National Guard Camp on August 10 and signed on that day.

The instrument in question consists of only one paragraph. It is dated August 3. It has appended to it the signatures of Ira Jones, Orvid Jones, young Clegg, and Hamilton. It recites the formation of the CIM and the election of Ira Jones as bargaining agent. It specifies dues of

$2.00 per month payable to the bargaining agent who shall act as treasurer. It provides that any contract of the union shall be ratified by majority vote of its members and that the office of the bargaining agent-treasurer may be terminated by majority vote.

On the afternoon of August 3 Clegg sent his wife with the CIM document bearing the signatures of Ira Jones and young Clegg to the local NLRB office to file a representation petition.

In August Clegg and Ira Jones negotiated a new contract. This was dated and signed August 7 and was retroactive to August 3. Jones testified that there were two negotiating sessions; that he discussed the bargaining progress with the men; that he told Clegg the men felt they should have a 10¢ raise; that they were satisfied as to "conditions, holidays, vacations, so forth, as they were"; that he didn't like, however, the old contract's provision for double time on Saturdays after the first four hours and preferred straight time and a half for the entire day on Saturday; that customers had complained about double time and, as a consequence, the men got none and went home after four hours; that Clegg agreed to the Saturday change and to the 10¢ increase; that "he later came up with a fifteen-cent raise which I didn't demand or ask for"; and that the employees were all pleased with that raise. Clegg testified that he didn't recall the 10¢ offer and that to his memory he offered just 15¢ and it was accepted.

The contract was drawn accordingly. Mary Clegg typed it, following the form of the expired IAM contract. Jones showed it to the men and, after ascertaining that it was acceptable to them, it was signed.

There was evidence that dues had been collected for CIM and that it had a bank account.

CIM also filed a petition with the Board but that petition and the one presented by Mrs. Clegg were dismissed upon the issuance of the Board's complaint based upon charges filed by IAM.

*The rulings below.* The trial examiner found that CIM was "germinated, nurtured, and consummated" by the company; that on August 3 "the CIM, with suddenness, was created"; that the representation petition was filed "notwithstanding that only one of four employees eligible for inclusion in the unit had signed the document" (although the local Board office stated that only one signature was necessary); that Clegg had brought the organization document to Fensenmeyer (although Jones beforehand had presented it to Fensenmeyer and when Clegg showed it to him later he made no request of the employee to sign it); that Mrs. Clegg asked Orvid Jones to sign the paper (although Orvid was the son of Ira and testified on the stand, admittedly contrary to prior affidavits, that it was his father who had brought it to him); that the 15¢ increase was made without demand; and that the company's purported recognition of IAM up to the contract expiration date was a sham. He concluded that a wrongdoer must not profit from his malfeasance and that the company had engaged in unfair labor practices. He recommended that the company be ordered to cease and desist from refusing to bargain collectively with IAM, from refusing to supply it with wage data, from dominating CIM, from recognizing CIM until it acquired certification, and from giving effect, but without detriment to its employees, to the agreement with CIM, and that it be required to post the usual notices.

The Board panel adopted the examiner's findings and recommendations but went further and ordered disestablishment of CIM. Specifically, it found that the agreement with CIM "was consummated after minimal discussion"; that that agreement "included therein a wage increase 50 percent higher than the increase requested by the CIM" (the difference between ten and fifteen cents); that this increase "was made retroactive without any request for such action" (the period of retroactivity was four days); that "the record discloses no independent basis for the existence of the

CIM"; that the company "was attempting to avoid its obligation to bargain in good faith with the designated majority representative of its employees"; and that the company's refusal to supply information as to Jones' wages was bad faith bargaining.

■ *The § 8(a) (2) issue.* After the entry of the Board's order the Supreme Court decided International Ladies' Garment Workers' Union, AFL–CIO v. NLRB, 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762. In that case a union and an employer had entered into an agreement by which the employer recognized the union as the exclusive bargaining representative of certain of his employees. At the time when a "memorandum of understanding" was signed by the union and the employer, only a minority of the employees in the unit supported the union. Six weeks later, that memorandum matured into a formal agreement and by that time the union in fact represented a majority of the employees. The court held that this later-acquired majority representation was of no consequence; that the earlier recognition of the minority union was an accomplished fact which deprived the majority of their right to choose their own representative; that the agreement was void in its entirety and was unenforceable even as to the consenting employees; that the employer's recognition of the union constituted unlawful support of it, in violation of § 8(a) (2) and § 8 (a) (1); and that the prohibited conduct was not excused by any showing of good faith. Consequently, the Board's order that the unfair labor practices be discontinued and that an election be forthcoming was held to constitute an appropriate remedy.

That case seems factually to fit the one before us. At the time the company recognized CIM and executed the bargaining agreement with it, there was clearly a representation question in existence

and unresolved. Only Ira Jones of the eligible employees had signed the organization paper by August 3 and by August 7, when the bargaining agreement was signed, only Hamilton's signature had been added. These two were but half of the four eligible employees and did not constitute a majority. Although Orvid Jones' attitude was perhaps to be inferred, inasmuch as he was Ira's son, we are not at liberty to presume his vote in the face of a record which is silent on that subject except for the trial examiner's exclusion of proffered testimony from Orvid as to instructions he had left with his father concerning an independent union. We thus have, as was the situation in the Garment Workers' case, the accomplished fact of recognition of the new union and an agreement with it before it was formally authorized by a majority; the immaterial fact of later majority representation when Orvid Jones signed on August 10; and the additional immateriality of good faith, if it existed, on the part of the Cleggs. The Garment Workers' case requires us to hold that the company's premature recognition of CIM and its negotiations with it were violative of §§ 8(a) (2) and 8(a) (1) of the Act, and that the collective bargaining agreement of August 7, 1959, must not be given full effect.

■■ *The remedy for the § 8(a) (2) violation.* As has been mentioned, the Board, in contrast to the remedy recommended by its trial examiner, ordered the disestablishment of CIM. The Supreme Court in NLRB v. District 50, United Mine Workers of America, 1958, 355 U.S. 453, 458–60, 78 S.Ct. 386, 2 L.Ed.2d 401, noted the Board's practice of ordering disestablishment of a dominated union but of employing a lesser remedy in the case of an assisted but undominated union, and observed that the disestablishment had been "upheld by the courts only in the case of a dominated union".[3] The domination standard is ac-

---

3. Examples of disestablishment in dominated cases are NLRB v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 263, 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L. R. 307; NLRB v. Southern Bell Telephone & Telegraph Co., 1943, 319 U.S. 50, 63 S.Ct. 905, 87 L.Ed. 1250; Virginia Electric & Power Co. v. NLRB, 1943, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568.

tual control, as distinguished from mere assistance. NLRB v. Newport News Shipbuilding & Dry Dock Co., 1939, 308 U.S. 241, 249, 60 S.Ct. 203, 84 L.Ed. 219. The test "is not an objective one but rather subjective, from the standpoint of employees". NLRB v. Thompson Products, Inc., 6 Cir., 1942, 130 F.2d 363, 368; Chicago Rawhide Mfg. Co. v. NLRB, 7 Cir., 1955, 221 F.2d 165, 168.

 In the light of this standard, and although we are fully aware that we are not to substitute our judgment on disputed facts for that of the Board, NLRB v. Link-Belt Co., 1941, 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368, NLRB v. Nevada Consolidated Copper Corp., 1942, 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305, we fail to find in this record any substantial evidence, as prescribed by § 10(e) of the Act, 29 U.S. C.A. § 160(e), to support the finding of company domination as contrasted with company assistance short of domination.

The Board's finding of domination rests on (a) what it says is the company's selection of Ira Jones to be the business agent; (b) the company's hasty recognition of CIM; (c) Mary Clegg's typing assistance; (d) the company's selection of the CIM name; (e) Clegg's solicitation of Fensenmeyer; (f) Mrs. Clegg's solicitation of Orvid Jones; and (g) the company's granting of the "50% wage increase".

The record, so far as Jones' selection as business agent is concerned, is contrary to the Board's finding. Jones' own testimony that he was selected by the employees and not by the company stands unopposed by that of his fellow employees. When the remaining factors— having in mind that Jones and the other employees had the opportunity further to revise the organization document; that Fensenmeyer, as well as Clegg, denied any solicitation character to their conversation; that Mrs. Clegg's testimony, on which the trial examiner and hence the Board in part relied, is only to the effect that she took the document to Jones from the upstairs office where he had left it and had no discussion with

or showed the paper to any other employee—are viewed, as they must be, in company with the pre-existing talk among all the employees of an independent union and with the complete absence of the usual components of threats and discriminatory discharges, it is readily apparent that the Board's case falls far short of the actual control required for domination. Compare Coppus Engineering Corp. v. NLRB, 1 Cir., 1957, 240 F.2d 564, 571–574; Humble Oil & Refining Co. v. NLRB, 5 Cir., 1940, 113 F.2d 85. We therefore conclude that the Board's finding of domination of CIM by the company was erroneous and that its order of disestablishment is not to be enforced.

 *The § 8(a) (5) issue.* The Board's ultimate finding that the company refused to bargain collectively with IAM rests on three subsidiary findings: (a) that the company refused to bargain at all after the existing contract expired on July 31, 1959; (b) that it refused to comply with the IAM's request for information as to Ira Jones' rate of pay, and (c) that its negotiations with IAM were rigid and disparate as compared with its later negotiations with CIM.

The company did refuse to bargain with IAM after Friday, July 31. While it is clear from the very wording of § 8 (a) (5) that an employer's refusal to bargain with the employees' majority representative is a violation, it is equally clear that an employer need not, and indeed he must not, bargain with an uncertified union, as was IAM here, which loses its majority status as a result of repudiation by the employees. This is the unavoidable implication of the Garment Workers' case, supra, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762, and its predecessors. That case cuts both ways. If it serves to negate the propriety of a bargaining process with an uncertified minority group (CIM), it also serves to negate the propriety of continuing the bargaining process with a similarly uncertified minority group (IAM) despite the latter's having once been the bargaining agency. Prior status does not entitle an uncertified union to continued

recognition as bargaining agent after it has lost support of the majority. NLRB v. Mayer, 5 Cir., 1952, 196 F.2d 286, 289; Glendale Mfg. Co. v. Local No. 520, etc., 4 Cir., 1960, 283 F.2d 936, 939–40, cert. den. 366 U.S. 950, 81 S.Ct. 1902, 6 L. Ed.2d 1243. See also American Rubber Products Corp. v. NLRB, 7 Cir., 1954, 214 F.2d 47, 52–54. The rule is otherwise when a union has been certified; then the union is protected against peremptory withdrawal of recognition for a reasonable time following certification. Brooks v. NLRB, 1954, 348 U.S. 96, 75 S. Ct. 176, 99 L.Ed. 125. The result is also otherwise where a non-certified union loses its majority as a result of an employer's unfair labor practice. Franks Bros. Co. v. NLRB, 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; Medo Photo Supply Corp. v. NLRB, 1944, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007; NLRB v. Wm. Tehel Bottling Co., 8 Cir., 1942, 129 F.2d 250, 254.

■ This brings us to the question whether there was a causal relationship between IAM's loss of majority status and any unfair labor practice of the company. We conclude that there is no substantial evidence of any such relationship. The record incontrovertibly shows that prior to any unfair labor practice by the company there was employee dissatisfaction with IAM and there were employee discussions, not prompted by the company, about the formation of an independent union. It also shows that by August 4 IAM had lost its majority representation by voluntary action on the part of Ira Jones and Hamilton.

We are not persuaded by the Board's points as to failure to divulge wage information and comparative bargaining methods. We recognize that the cases have supported a determination of the Board that failure to furnish wage information may constitute an unfair labor practice under § 8(a) (5). NLRB v. F. W. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235, reversing 9 Cir., 235 F.2d 319; International Woodworkers of America, etc., v. NLRB, D.C.Cir., 1959, 105 U.S.App.D.C. 37, 263 F.2d 483, 484; J. I. Case Co. v. NLRB, 7 Cir., 1958, 253 F.2d 149, 152. But the wage information involved here was only that of Jones. The wages of all other employees had been revealed. We are impressed by the de minimis aspect of this; by the fact that the information as to Jones must have been effortlessly and readily available to Fay and IAM through mere inquiry of Jones himself, compare NLRB v. Item Co., 5 Cir., 1955, 220 F.2d 956, 959, cert. den. 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746, 352 U.S. 917, 77 S.Ct. 217, 1 L.Ed.2d 123; NLRB v. Whitin Machine Works, 4 Cir., 1954, 217 F.2d 593, 594, cert. den. 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242; by the fact the record does not show the unavailability of this information from Jones; and by the fact that the cases relied upon by the Board [4] all relate to situations of substantial numbers of employees, with obvious inconvenience and perhaps unfairness to the union were it to be required to obtain the information from the many individuals concerned.

■ The evidence as to bargaining with the IAM shows an offer by the union and a counter-offer by the company which was above the 1959 median settlement in all industry and in the machine industry. From that point on the record shows equally adamant positions taken by both sides. There is nothing in the record to connect the company's firm stand with any then existing knowledge of the employees' discontent with IAM. Inability to reach an agreement does not of itself constitute a refusal to bargain. NLRB v. Mayer, supra, p. 290 of 196 F.2d. The Act does not compel agreement. NLRB v. American National Ins. Co., 1952, 343 U.S. 395,

4. International Woodworkers of America. etc., v. NLRB, supra, 105 U.S.App.D.C. 37, 263 F.2d 483 (over 600 employers, one of whom alone had about 600 employees, 118 NLRB 1095); Boston Herald-Travelers Corp. v. NLRB, 1 Cir., 1955, 223 F.2d 58, 59 (some 500 employees); NLRB v. F. W. Woolworth Co., supra, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235 (about 70 employees, 109 NLRB 196).

402–404, 72 S.Ct. 824, 96 L.Ed. 1027; NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 45, 57 S.Ct. 615, 81 L. Ed. 893. Neither do we find sufficient substance in the claimed disparate treatment between IAM and CIM. Compare NLRB v. Hannaford Bros. Co., 1 Cir., 1958, 261 F.2d 638. We regard NLRB v. Christian Board of Publication, 8 Cir., 1940, 113 F.2d 678, relied upon by the Board, as distinguishable on its facts.

■ We presume to observe that the difficulty in this case apparently rests on the small and familial character of the enterprise. We appreciate that it is in precisely such a circumstance that domination and interference can take root and flourish. We know, too, that a court cannot require the Board to relieve a small employer of a duty that may be exacted from a large one. Brooks v. NLRB, supra, p. 104 of 348 U.S., 75 S.Ct. 176. But we conclude that the Board has attempted to reach too far in the case of this small concern.

■ We feel that the only reasonable solution is to afford the employees the opportunity of a supervised election. The passage of time makes this particularly feasible. Meanwhile the rights gained by the employees under the new contract are not to be prejudiced. International Union of United Brewery, etc., v. NLRB, D.C.Cir., 1961, 298 F.2d 297, 300, footnote 8.

Accordingly, in exercise of the power vested in this court by § 10(e) of the Act, an appropriate decree will be entered enforcing the Board's order to the extent indicated in this opinion. Specifically, the order will be enforced as to Paragraphs 1(b) (insofar as it relates to interference with and support of CIM), 1(c) (except as to its reference to "any successor" to CIM), 1(d), 1(e), 2(b) (except as to the disestablishment of CIM), 2(c) (to the extent that it will authorize the posting of notices consistent with the conclusions we have reached), and 2(d). Enforcement will be conditioned, however, upon the Board's ordering an election of the company's employees within sixty days after our decree becomes final and will, to the appropriate extent, be dependent upon the outcome of that election. See NLRB v. Adhesive Products Corp., 2 Cir., 1960, 281 F.2d 89, 91–92; NLRB v. Marcus Trucking Co., 2 Cir., 1961, 286 F.2d 583, 594–595; NLRB v. Superior Fireproof Door & Sash Co., 2 Cir., 1961, 289 F.2d 713, 723–724; Perry Coal Co. v. NLRB, 7 Cir., 1961, 291 F.2d 126. In all other respects, enforcement is denied.